JOHN T. JASNOCH (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

[Additional Counsel on Signature Page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS SANDYS, on Behalf of Himself and Derivatively on Behalf of THE ALTRIA GROUP, INC., | Case No. |
| Plaintiff, | VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT AND JURY DEMAND |
| v. | |
| HOWARD A. WILLARD III, WILLIAM F. GIFFORD, JR., KEVIN C. CROSTHWAITE, KEVIN BURNS, NICHOLAS J. PRITZKER, RIAZ VALANI, and JUUL LABS, INC., | |
| Defendants. | |
| v. | |
| THE ALTRIA GROUP, INC., | |
| Nominal Defendant. | |

COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     PARTIES ........................................................................................................... 4

    A.      Plaintiff .................................................................................................. 4

    B.      Defendants ............................................................................................. 4

    C.      Nominal Defendant................................................................................ 5

III.    JURISDICTION AND VENUE ......................................................................... 5

IV.     DEFENDANTS' DUTIES ................................................................................. 7

V.      STATEMENT OF FACTS ................................................................................. 8

    A.      Altria Is the Market Leader in a Profitable but Declining Market ....................... 8

    B.      By 2018, JUUL Was Under Fire for Illegally Marketing to Youth and Misleading Consumers About Its Addictiveness ............................................. 10

    C.      Officers at Altria Breached Their Fiduciary Duties to the Company By Pursuing the JUUL Investment ...................................................................... 15

    D.      JUUL Aids and Abets Altria Officers' Breach of Fiduciary Duty .................... 38

    E.      Altria Suffers Ongoing Damages from Defendants' Misconduct ..................... 40

VI.     DERIVATIVE ALLEGATIONS ..................................................................... 40

VII.    FIRST CLAIM FOR RELIEF.......................................................................... 41

VIII.   SECOND CLAIM FOR RELIEF ..................................................................... 41

IX.     PRAYER FOR RELIEF ................................................................................... 42

X.      JURY DEMAND.............................................................................................. 43

# I.      INTRODUCTION

1.      Plaintiff, Thomas Sandys ("Sandys" or "Plaintiff"), brings this action derivatively on behalf of Nominal Defendant the Altria Group, Inc. ("Nominal Defendant" or "Altria" or the "Company") against Howard A. Willard III, William F. Gifford, Jr., Kevin C. Crosthwaite, Kevin Burns, Nicholas J. Pritzker, Riaz Valani, and JUUL Labs, Inc. ("JUUL"), for breaches of fiduciary duty or aiding and abetting breaches of fiduciary duty to the harm of the Company.

2.      Altria and JUUL have both attempted to cast themselves as socially responsible companies who promote public health.  But the inconvenient truth for JUUL and for Altria is that, as companies focused on tobacco-derived, nicotine-delivery products, their business success depends on addiction to dangerous substances.  In particular, their businesses depend on hooking new generations of young users.

3.      JUUL, a San Francisco-based vaping startup often grouped with tech companies rather than the traditional consumer product market, saw a meteoric rise between 2017-2019, fueled by its popularity among underage users.  JUUL claims that it has never targeted, and will never target, underage users.  But its early youth-oriented ads that were based on youth-oriented tobacco ads from an earlier generation, placed in media such as *Vice* Magazine, Cartoon Network, or nickjr.com, belied this sentiment.  So did its heavy promotion of fruity flavors, its condonation of consumer-generated social media that made JUUL's products so popular among teenagers that it turned JUUL into a verb (vaping a JUUL became known as "Juuling,"), and its early de-emphasis of nicotine in its marketing, despite the fact that JUUL actually placed more nicotine into its products than it disclosed, so that each JUUL pod contained far more nicotine delivered far more quickly than its claimed equivalent to a pack of cigarettes.

4.      Altria, owner of the country's dominant brand of cigarettes, Marlboro, is also popular among the young, even though cigarette smoking has decreased among underage users. Altria saw that its traditional combustible cigarettes were declining year by year, and that its ability to preserve its revenues by raising prices that its addicted customers could stomach was beginning to wane.  It also tried to enter the e-cigarette or vaping market, and had spent tens and even

hundreds of millions of dollars on trying to create and sell a popular product.  But it had failed.  By 2018, Altria had only between a 4% to 11% share of the vaping market.  Having failed to create its own popular e-cigarette electronic nicotine delivery system ("ENDS") in-house, it desperately sought to acquire – or at least partner with – another company with more success in the field.

5.     The obvious candidate for an acquisition or a partnership was JUUL, which, by 2018, had more than 70% of the e-cigarette market.  However, JUUL refused to be acquired and its chief negotiators, Chief Executive Officer ("CEO") Burns and JUUL Board directors Nicholas J. Pritzker ("Pritzker") and Riaz Valani ("Valani"), insisted on Altria's exit from the e-cigarette market and a commitment to not compete in that space as a non-negotiable condition to any kind of deal.

6.     Altria's chief negotiators and architects for a JUUL deal, then-CEO Howard Willard ("Willard"), then-Chief Financial Officer ("CFO") Billy Gifford ("Gifford"), and then-Chief Growth Officer K.C. Crosthwaite ("Crosthwaite") eventually agreed, and more importantly, also agreed to provide cross-marketing for JUUL, give JUUL the premium retail space Altria had previously reserved for itself, and a license to Altria's own e-cigarette intellectual property.  They then became enthusiastic emissaries for JUUL, with Crosthwaite sitting on JUUL's board as a non-voting observer from Altria, but with full access to JUUL's information, which was reviewed by JUUL's active board that was involved in day-to-day management, and with the full opportunity to coordinate between Altria and JUUL.

7.     On December 20, 2018, Altria announced that it invested $12.8 billion in JUUL, financing the transaction by doubling Altria's debt, for a 35% stake that valued JUUL at $38 billion.  As part of the investment, Altria issued JUUL a $2 billion payment that JUUL distributed as bonuses to its employees.  Altria made this investment despite the fact that throughout 2018, JUUL had become subject to increasing public scrutiny, regulatory actions, and civil lawsuits over its marketing toward youth and its misleading claims about safety and its nicotine content.  And now, Altria was committing to marketing and distributing JUUL products, thus exposing Altria to the same reputational harm and legal liability.

8.      Altria's investment in JUUL, while performing well initially, by late 2019 was nosediving in value.   In summer of 2019, an epidemic of vaping illnesses swept the country, leading to thousands of hospitalizations and at least 60 deaths.   These vaping illnesses, although in the main not connected to JUUL ENDS, drew increased scrutiny into and a dramatic growth in lawsuits against JUUL as the vaping market leader.   Furthermore, the existing regulatory actions picked up momentum, including a Congressional investigation and several lawsuits by state attorneys general.   Some of the key claims in the initial set of lawsuits before this Court had by then survived motions to dismiss.

9.      JUUL's reaction to the increased scrutiny, however, actually allowed for greater coordination and collusion between JUUL and Altria.   Crosthwaite became JUUL's CEO at the end of September 2019, and Altria's JUUL Board observer became Gifford, who in April 2020, became Altria's CEO.   Altria's chief regulatory officer, Joseph Murillo ("Murillo") also became JUUL's chief regulatory officer.   And JUUL is now in the process of moving its headquarters from San Francisco to Washington, D.C., so it will become physically closer to Altria.   All of these increasing ties have also coincided with Altria being drawn further into the regulatory actions and lawsuits being taken against JUUL, including a securities fraud lawsuit in the Eastern District of Virginia brought by Altria stockholders (the "Securities Action"), a MDL in this District (the "Class Action"), an antitrust action brought by the Federal Trade Commission ("FTC") seeking to unwind Altria's investment (the "FTC Action"), and private antitrust suits brought against Altria and JUUL in this District.

10.      Meanwhile, in addition to increased exposure to liability, Altria has also suffered from JUUL's declining businesses, so that Altria has had to write down more than $8 billion of its investment.

11.      All of these risks were well-known to Altria's officers when they negotiated and completed the JUUL transaction at the time of the deal, a fact that Altria admits in its defenses to other lawsuits.   Yet Altria's officers went ahead with those transactions anyway.   Moreover, there is strong evidence that Altria's officers not only went ahead with a risky transaction but actively

colluded with JUUL and its officers and directors to engage in JUUL's illegal marketing and misrepresentation as to its safety and nicotine content, as well as engaged in anticompetitive conduct.  For all these reasons, Plaintiff brings this Action against certain Altria officers, for breaching their fiduciary duties to Altria, as well as JUUL and certain of its directors and officers, for their role in aiding and abetting those breaches.

## II.    PARTIES

### A.    Plaintiff

12.    Plaintiff Thomas Sandys is, and at all times relevant was, a resident of the state of Ohio, and has held Altria stock continuously since 1991.

### B.    Defendants

13.    Defendant Willard was the CEO and Chairman of Altria between May 2018 to April 2020, when he retired.  Before becoming CEO, Willard was the Chief Operating Officer ("COO") of Altria.

14.    Defendant Gifford was the Vice Chair and CFO of Altria until Willard's retirement as CEO, upon which Gifford became the CEO.

15.    Defendant Crosthwaite was the Chief Growth Officer ("CGO") of Altria until September 25, 2019, and since September 25, 2019, has been the CEO of JUUL.

16.    Defendants Willard, Gifford, and Crosthwaite (for the period up to September 25, 2019) are collectively referred to as the "Altria Defendants."

17.    Defendant Burns was CEO of JUUL from on or about December 11, 2017 until September 25, 2019.

18.    Defendant Pritzker is a director on the Board of JUUL.

19.    Defendant Valani is a director on the Board of JUUL.

20.    JUUL is a corporation incorporated in Delaware and headquartered in San Francisco, California, that sells pod-based ENDS called the JUUL.  JUUL was founded by Stanford graduate students Adam Bowen ("Bowen") and James Monsees ("Monsees"), who were long-term smokers attempting to find a way to quit.  Purportedly to that end, in 2003, they founded

Ploom, and their first device was a tobacco-heating device, also called Ploom.  But that device did not achieve widespread commercial success.  However, Ploom was eventually partially acquired and then spun off to Japan Tobacco, and Bowen and Monsees then worked on their next device, the PAX, and rechristened their company PAX Labs, Inc.  The PAX achieved cult success when it was repurposed by many customers as a cannabis vaping device.  But it was not until PAX Labs, Inc., designed the "JUUL," a high-nicotine delivery device that was shaped like a USB drive, that it achieved widespread commercial success.  The company was then renamed JUUL Labs, Inc.

21.     Defendants Burns, Pritzker, Valani, Crosthwaite (for the period from September 25, 2019 to the present), and JUUL are collectively referred to as the "JUUL Defendants."

**C.     Nominal Defendant**

22.     Nominal Defendant Altria is a corporation headquartered and incorporated in Virginia that engages primarily in the sale and distribution of tobacco products.  Altria is a holding company that operates through numerous subsidiaries, including Philip Morris USA, Inc. ("Philip Morris"), which manufactures and sells – within the United States – some of the country's top tobacco brands, including the leading U.S. traditional or combustible cigarette brand, Marlboro.  Marlboro captures 40% of the domestic market, and has a larger market share than the next seven leading domestic brands combined.  In addition to traditional combustible cigarettes, Altria, through subsidiaries, also sells cigars, heated tobacco, and smokeless tobacco products, and it also invests in alcohol, cannabis, and e-cigarette businesses.  Altria trades on the New York Stock Exchange under the symbol MO, and has a market capitalization of approximately $77 billion.  It generates net revenues of approximately $25 billion per year.

## III.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over all parties pursuant to 28 U.S.C. §1332(a)(2), because the Plaintiff is a citizen of a different state from every Defendant, and the matter in controversy exceeds $75,000, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

24.     Plaintiff is a resident and citizen of the State of Ohio.

25.     Nominal Defendant Altria is a resident and citizen of the Commonwealth of Virginia, where it is both incorporated and headquartered.

26.     Defendants Willard and Gifford are residents and citizens of the Commonwealth of Virginia.

27.     Defendants Crosthwaite, Burns, Pritzker, and Valani are residents and citizens of the State of California.

28.     Defendant JUUL is incorporated in the State of Delaware, is headquartered in the State of California, and is in the process of transitioning to a headquarters in Washington, D.C.

29.     This Court has personal jurisdiction over each of the Defendants named herein because each Defendant is either a corporation incorporated, maintaining its principal executive offices, and operating in this District, or is an individual who maintains a place of business in the District or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Further, Defendants purposefully directed or conducted much of the wrongdoing complained of herein in this District.

30.     The Court has general jurisdiction over JUUL and the JUUL Defendants because they are (or during the relevant periods were) residents of California.

31.     The Court also has specific jurisdiction over the JUUL Defendants because they conducted board meetings and operations in California, in the conduct underlying this litigation.

32.     This Court has personal jurisdiction over Willard and Gifford because their conduct at issue in this litigation, namely their negotiation and oversight over the JUUL investment, was directed toward or occurred in California.

(a)     At least one, and likely several, negotiation sessions were conducted in San Francisco, California;

(b)     Defendant Willard, at least on one instance, visited JUUL headquarters in San Francisco, California, in conduct underlying this litigation;

(c)     Defendant Gifford, since October 2019, has been Altria's designated observer on JUUL's board, and therefore, attended JUUL Board meetings in San Francisco, where he engaged in conduct underlying this litigation; and

(d)     Defendants Willard and Gifford both communicated with JUUL Defendants when JUUL Defendants were located in California, in conduct underlying this litigation.

33.     The Court has personal jurisdiction over Crosthwaite because he has been a resident of California since October 2019, between December 2018 to September 2019, conducted business in California in the conduct underlying this litigation by attending JUUL Board meetings in California, and before then, conducted business in California in the conduct underlying this litigation when he assisted with negotiating the JUUL transaction during negotiations in California, or projected himself into California by communicating with JUUL Defendants located in California to negotiate the JUUL transaction.

34.     This Court has personal jurisdiction over Altria because its officers' conduct at issue in this case occurred in, or was, directed toward California.

35.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§1391(b)-(d) and 1441(a), because, *inter alia*, each Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced, because the JUUL Defendants reside in this District, and because the Altria Defendants operate businesses in this District and maintain contacts within this District that are significant and sufficient to subject it to personal jurisdiction.

## IV.     DEFENDANTS' DUTIES

36.     The Altria Defendants have fiduciary duties to Altria. The Altria Defendants are, or were at the time of the conduct underlying these allegations, officers of Altria. According to the Supreme Court of Virginia, "A corporate officer has the same duties of fidelity in dealing with the corporation that arise in dealings between a trustee and a beneficiary of the trust." *Giannotti*

*v. Hamway*, 239 Va. 14, 24 (1990).  They must exercise good faith.  *Glass v. Glass*, 228 Va. 39, 47 (1984).

37.     At a minimum, these duties would mean that the Altria Defendants cannot violate the law or condone the Company's engaging in, or abetting, illegal activity.  Virginia Corporations can only "engag[e] in any lawful business[.]"  Va. Code §13.1-626.  This necessarily implies that an officer, charged with effecting the corporation's purpose, cannot engage in unlawful business. *Cf. In re Massey Energy Co.*, C.A. No. 5430, 2011 WL 2176479, at *21 (Del. Ch. May 31, 2011) ("For fiduciaries of Delaware corporations, there is no room to flout the law governing the corporation's affairs.").

38.     Furthermore, "[u]nder Virginia law, one who aids and abets a third party's breach of fiduciary duty may be held liable for providing that assistance. . . . [C]onstructive notice of a breach of fiduciary duty suffices to hold a third party liable for participation in the breach."  *Tyson Toyota, Inc. v. Globe Life Ins. Co.*, 45 F.3d 428 (Table) (4th Cir. 1994).  Thus, the JUUL Defendants, as third parties, can be liable for aiding and abetting the Altria Defendants' breach of fiduciary duty.

## V.     STATEMENT OF FACTS

### A.     Altria Is the Market Leader in a Profitable but Declining Market

39.     Altria is the parent company of long-standing mainstays in the traditional smoking market, including, most notably, Philip Morris.  Altria, through Philip Morris, is best known for its Marlboro cigarette brand, which has been the best-selling cigarette brand in the United States for the last 45 years.  Marlboro captures 40% of the domestic cigarette market, more than the next seven largest brands combined.

40.     Altria's business, because it has a captive market through addicted smokers, is very profitable.  During annual year 2019, Altria generated an operating income of more than $10 billion.  Because of its profitability, Altria is able to maintain a generous dividend, regularly paying out more than $6 billion per year.

41.     However, Altria's business is also faced with many challenges.  The danger of cigarette smoking has been well-known for decades, the Company is faced with numerous regulatory constraints, and since 1998, it and other tobacco companies have had to follow the marketing restrictions under the Master Settlement Agreement ("MSA") that tobacco companies reached with the attorneys general of most of the United States.  Most importantly, cultural changes and increasing health awareness has made cigarette smoking less attractive to younger people, so Altria's cigarette sales have been decreasing for years.  For some time, Altria was able to arrest the decline in revenues by raising prices on its products with minimal loss in existing customers, because Altria's customers are addicted to the product, but lately, cigarette sales have been decreasing more quickly.  Because of the perception of a declining market, Altria's stock performance has suffered, and despite consistent share buybacks to prop up the price, the stock has lost more than a third of its value since mid-2017.

42.     Adding to Altria's troubles, in 2017, the U.S. Food and Drug Administration ("FDA") announced that it would reduce the amount of nicotine allowed in cigarettes with the goal of eventually reducing this to a non-addictive level.  In March 2018, the FDA announced that not only would it seek to reduce nicotine in combustible cigarettes, but it also recognized that adult addicts should have alternative sources of nicotine that would be safer than combustible cigarettes and therefore signaled that it may encourage the development of e-cigarettes or similar devices as potential smoking cessation tools.  This presented Altria with both the prospect of a more rapidly declining traditional cigarette market, as well as a signal that further investment in the e-cigarette market would pay off.

43.     Indeed, early on, Altria identified the potential of the e-cigarette or vaping market. In 2014, Altria began to sell its own e-cigarette, developed by its subsidiary, Nu Mark LLC ("Nu Mark"), called the MarkTen.  Altria attempted to establish a strong market position with an aggressive $35-million marketing campaigning – 40% of all marketing dollars spent on e-cigarettes in 2014.  Altria's then-CEO, Marty Barrington, claimed that Altria was "the market

1  leader." Altria also made several acquisitions of smaller vaping companies, such as buying Green

2  Smoke, Inc., in 2014 and Cync in 2016.

3      44.  The MarkTen was, at best, a moderate success for Altria. In 2017, its market share

4  was approximately 14%, but JUUL by then was already the market leader with a growing market

5  share of 40%. MarkTen, by 2018, was down to between 4% to 11%, while JUUL had gained to

6  more than 70% of the vaping market. MarkTen's moderate and fading success could not become

7  anything close to a substitute for Altria's traditional products. Indeed, in responding to the FTC

8  Action, Altria attempts to argue that it never was a credible threat to JUUL and that despite its

9  substantial investment in the vaping market, its efforts there were a failure.

10      45.  Faced with the Company's inability to crack the code for a product that the FDA

11  appeared to express openness to, but also faced with a declining traditional business that was likely

12  to face more significant restrictions in the near future, the Altria Defendants became desperate to

13  do a deal. Instead of picking a relatively safe partner, however, the Altria Defendants zeroed in

14  on the controversial market leader of the vaping market.

15      **B.**    **By 2018, JUUL Was Under Fire for Illegally Marketing to Youth and Misleading Consumers About Its Addictiveness**

16

17      46.  This controversial leader was JUUL. Although JUUL had established market

18  dominance by 2017 and continued to grow through the first half of 2019, warning signs were

19  present as early as 2017, and by 2018, those signs had become alarm bells. There were two

20  ingredients to JUUL's success, one based on engineering and the other on marketing. The

21  troubling aspects of both elements were readily apparent and the subject of widespread public

22  reporting, starting in 2017, and becoming a torrent of investigative reporting, regulatory scrutiny,

23  and civil lawsuits by 2018.

24      47.  The first element of JUUL's success was the engineering component. JUUL and

25  its predecessor spent years developing a product that would be able to deliver a high dose of

26  nicotine with minimal unpleasant side effects. JUUL's engineers sought to reduce or eliminate

27  the "throat hit," the sensation from smoking that causes a burning sensation in the throat and

28

manifests in coughing.  They did so by combining nicotine with benzoic acid to create a nicotine salt.

48.    JUUL also admitted that the nicotine salt was meant to deliver as much nicotine as a cigarette, so that one pod would be equivalent to one pack of 20 cigarettes.  This high nicotine delivery was by design so that it would provide an adequate substitute for the nicotine a smoker would get from cigarettes, and therefore, JUUL claimed, would induce them to quit cigarettes by switching to JUUL.  But what JUUL failed to tell the public was that JUUL contained *more* nicotine than cigarettes because a greater percentage of the nicotine in the nicotine salt solution can be released than the nicotine from a traditional burning cigarette (where most of the nicotine remains in the tobacco and isn't burned into the smoke).  Thus, JUUL pods effectively deliver more nicotine and more quickly than a pack of cigarettes.  In addition, because JUUL does not burn out like a cigarette, there is less of a natural stoppage point to ingesting nicotine.  JUUL engineers recognized this and designed a kill switch to temporarily stop a JUUL device from delivering any more hits after a certain number of puffs, but JUUL management decided not to implement this kill switch.

49.    The other part of JUUL's success was achieved through marketing.  And JUUL's marketing was both misleading and actively promoted use by underage smokers with a wink and a nod.  To start with, JUUL's marketing was misleading about how much nicotine its product actually contained.  JUUL, on its website and on its packages, misleadingly represented that its products were "5% nicotine by weight."  A set of lawsuits before this Court (the "Early Class Actions") allege that JUUL's nicotine solution is actually at a 6.2% concentration, rather than the 5% concentration it discloses.  In ruling on motions to dismiss those lawsuits, this Court credited the allegations, and observed that "[t]his difference would constitute over 20% more nicotine than JUUL claims its products deliver."  *Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178, 1189 (N.D. Cal. 2018).

50.    Moreover, JUUL's insistence on classifying its nicotine concentration by weight was also misleading because the standard way to classify nicotine concentration was through

volume.  According to the Early Class Actions and the Class Action, even taking JUUL at its word, a 5% nicotine concentration by weight would be a 6% concentration by volume.  Measured against other products in the vaping market, which had a 3-4% concentration of nicotine by volume, JUUL would have even more nicotine than it represented.

51.  Furthermore, JUUL's more recent marketing has focused on its efficacy as a smoking cessation tool, by urging users to "Make the Switch."  But these marketing claims have drawn warning letters from the FDA because JUUL has made unsupported claims that it is "safer" than cigarettes or that it is effective as a smoking cessation tool.  But the FDA has cautioned JUUL that it has not been approved as a smoking cessation device, and that JUUL has not submitted studies to the FDA to support such claims.

52.  While JUUL officially recognized that the optimal outcome for a smoker would be to not use nicotine products, it maintained that getting a smoker to switch from combustible cigarettes to JUUL would provide health benefits because the health harms from cigarettes stemmed largely from the chemicals released from burning tobacco rather than nicotine itself.  JUUL, however, neglected to mention that the chemicals released from vapors could also create harms separate from those of cigarette smoke.  Throughout 2017 and 2018, experts cautioned that while there sometimes appeared to be a potential for harm reduction by switching to vaping from cigarette smoking, the long-term effects of vaping were unknown.  The potential harms of vaping unfortunately became a reality when, in 2019, an epidemic of vaping-induced respiratory illnesses swept the country, which landed almost 3,000 otherwise healthy young adults in the hospital, and killed at least 60 of them.  Although these vaping illnesses were, for the most part, not specifically connected to the use of JUUL, the epidemic brought home long-standing concerns raised by others that the long-term effects of vaping are unknown, thus making claims about their safety unfounded.

53.  Even aside from its unsupported safety claims and its misleading characterization of how much nicotine it contains, and despite its public proclamations otherwise, JUUL's business model has never depended solely, or even primarily, on smoking cessation.  Rather, from early after the JUUL device introduction, it has depended on illegally marketing and hooking underage

users and other non-smokers. While it repeatedly disclaimed that intention in public statements, its marketing materials belied those statements.

54.     JUUL's founders and other employees did extensive research into both the design and marketing of cigarette and other tobacco products by diving into the materials at the University of California, San Francisco, which contained a collection of millions of internal documents from tobacco companies that were produced as a condition of the MSA.  Ironically, these documents were meant to highlight the dangers of tobacco marketing and cigarette companies' knowing attempts to attract teenagers and other non-smokers, and then hook them on their products.  In doing so, JUUL intentionally modeled its own marketing campaigns (as well as many of its engineering decisions, such as the nicotine salt formulation) on old tobacco campaigns.  Now, JUUL was using these documents to hook a new generation of youth and non-smokers to their nicotine products.

55.     JUUL deliberately targeted young users from its launch in 2015.  JUUL promoted the product through social media and launch parties.  It engaged in an ad campaign, with the slogan, "Vaporized," that utilized bright colors and young models in provocative poses.  It also hired influencers on social media that were targeted to teenagers, while promoting or encouraging unofficial user-created JUUL-themed hash tags, which were even more popular among teenagers than JUUL's official social media channels.

56.     Meanwhile, JUUL also promoted fruity sweet flavors that appealed to young users and nonsmokers, such as mango, mint, crème brûlée, mixed fruit, and cucumber.  Flavored cigarettes (except menthol) had been banned by the FDA in 2009, and in announcing the ban, then Human and Health Services Assistant Secretary, Dr. Howard Koh stated, "Flavored cigarettes attract and allure kids into addiction."  This was also a finding by Congress in giving the FDA authority to regulate tobacco products.  And more recent studies have also focused on how menthol cigarettes have been targeted toward the youth and minorities and have been used to initiate non-smokers into cigarette smoking because the throat-soothing properties of menthol reduce the harshness of tobacco smoke for new smokers.  Yet, despite knowing all of this, JUUL not only

had fruity flavors but, by 2017, switched its marketing from explicitly youth-oriented to the type of marketing that would be geared toward non-smokers, because it positioned itself with dessert and coffee advertisements, including slogans such as "Leave room for JUUL" after a meal or "indulge in dessert without the spoon." JUUL's marketing, therefore, positioned JUUL as something pleasant and healthy. All of these ads were designed to appeal to young non-smokers rather than to existing smokers.

57. Moreover, throughout the 2015-2017 period, JUUL's marketing de-emphasized its nicotine content, which would have been a draw toward smokers looking for an alternative to cigarettes, but would not have been a draw to non-smokers. JUUL's advertisements only included disclosures about nicotine content in small print. And in 2018, by the time JUUL had captured more than 70% of the vaping market, a study by the Truth Initiative revealed that 63% of JUUL users between the ages of 15-24 did not know that JUUL always contains nicotine.

58. Furthermore, demonstrating that JUUL knew the difference between appealing to existing smokers or to non-smokers, JUUL only began to create an explicit smoking cessation campaign, called "Switch," in January 2019 – after lawsuits had initiated into JUUL's youth marketing and after the FDA made noise about JUUL's youth marketing. In these ads, JUUL tried to tell smokers to "make the switch" from combustible cigarettes to JUUL, and it used older models and more serious settings. However, the FDA raised concerns with this marketing campaign, as well, noting that JUUL appeared to make several unproven claims that implied JUUL was safer than traditional combustible cigarettes without providing scientific evidence to establish those claims, and that JUUL made unsupported claims about its effectiveness in getting smokers to quit, when JUUL had not gone through the approval process to be designated a smoking cessation device.

59. By 2017, it was undeniable that JUUL was becoming a sensation in high schools, with the act of vaping from a JUUL itself turned into a verb, "Juuling." As its popularity in high schools grew, public scrutiny also grew. By early 2018, numerous media were reporting the JUUL

epidemic in high schools.  And internal JUUL documents cited in the Class Action demonstrate that from early on, JUUL sought to "own the 'cool kid' equity."

60.     Despite the increasing negative press attention, JUUL took only incremental steps in response to slow down its spread among youth.  In November 2018, JUUL took down its own social media accounts, but this did little to slow down promotion on those platforms since, for years, JUUL had inspired numerous hash tags that it did not control.  At the same time, it stopped distributing its fruity flavors in stores, but it continued to sell mint and menthol in brick-and-mortar locations, and it continued to sell fruity flavors online.

61.     But in summer and fall of 2019, JUUL's business declined dramatically in the wake of the vaping illness epidemic, and only under that pressure, it took more steps to curb youth use. In August 2019, JUUL began to implement what it touted as a strict age verification system on its website.  And in October 2019, JUUL finally discontinued selling its fruity flavors completely. Finally, in November 2019, JUUL discontinued the sale of mint flavors.  However, to this day, JUUL continues to sell its menthol flavor.  As JUUL undoubtedly knew from its marketing research, menthol cigarettes were marketed towards young smokers, and therefore, by keeping the menthol flavor, JUUL was continuing to keep a hold in the underage smoking market with a wink and a nod.

### C.     Officers at Altria Breached Their Fiduciary Duties to the Company by Pursuing the JUUL Investment

62.     The Altria Defendants were desperate to enter the vaping market, but in doing so, through their investment in, and then collusion with, the JUUL Defendants, breached their fiduciary duties to Altria in three ways:

(a)     Even if they did not engage in active illegal activity, their pursuit of, and recommendation of, an investment in JUUL in the face of known risks was reckless, and therefore, constituted a bad faith violation of fiduciary duties to Altria, because it exposed Altria to reputational harm and legal liability through its participation, knowing or unknowing, in JUUL's wrongdoing;

(b)    Moreover, the evidence suggests that because of the Altria Defendants' knowledge of JUUL's operations and their knowledge of the tobacco industry, they knew about JUUL's misrepresentations and illegal marketing, and caused Altria to actively participate in the wrongdoing by assisting JUUL in marketing, and therefore, made Altria liable for disseminating misleading misrepresentations of JUUL's nicotine content and safety, and exposed Altria to liability for promoting use among youth users; and

(c)    In attempting to bolster Altria's business prospects, the Altria Defendants and JUUL Defendants conspired to engage in unfair trade practices and anticompetitive conduct.

i)    <u>The Altria Defendants Put Altria's Business at Risk by Recklessly Pursuing JUUL Despite the Known Risks</u>

63.    Willard, as Altria's COO at the time, began to have "confidential discussions" with JUUL in spring 2017, which continued for 18 months.  Even by 2017, JUUL's popularity among youth was apparent and so were its marketing tactics.  The youth-oriented marketing would have been most apparent to Willard and the other Altria Defendants because much of JUUL's early marketing was patterned off youth marketing by Altria's predecessor and subsidiary, Philip Morris.  The patterning off Marlboro was so obvious that JUUL's predecessor settled a trade dress and trademark lawsuit with Altria's subsidiary, Philip Morris, promising to refrain from using triangles and diamonds, in a pattern that resembled the trade dress of Marlboro cigarette packs (and in early versions of JUUL, the device itself was red and white just as Marlboro packages were).  JUUL's flavor packages were also designed to resemble early Marlboro flavor packs.

64.    The Altria Defendants knew about the reputational risks because JUUL's marketing campaigns were a matter of public record, and JUUL's nicotine salt formulation was patented, so that was also a matter of public information.  As Altria itself admitted in opposing the Securities Action, the facts about JUUL's youth use, nicotine, addictiveness, and marketing were well-known

public risks that were well-publicized throughout 2017 and 2018 when Altria was simultaneously seeking to invest in JUUL.

65.     And as Altria pointed out in its motion to dismiss the Securities Action, Willard made public statements about the risks, and when the investment was announced and shortly thereafter, Willard acknowledged that youth usage of JUUL products was a "big problem" and "could put the whole category at risk."  At the same time, despite the widespread public record demonstrating otherwise, Willard asserted that JUUL only had a few youth users.

66.     In the lead-up to the transaction, Willard showed a clear understanding of the regulatory risks and scrutiny Altria was under, and would be under, when during a quarterly earnings conference call on October 9, 2018, he was asked about his thoughts on the Massachusetts Attorney General's recent lawsuit against JUUL.  While he did not comment specifically on JUUL, he replied, "I think what we're seeing is that for quite some time, the tobacco industry has been expected to operate under a very specific set of rules, and the Master Settlement Agreement laid those out for the cigarette category. . . .  And we are always aware that the FDA and the Attorneys General are watching everything we do to make sure we're operating responsibly. . . .  And frankly, we appreciate the AGs making sure that there's a minimum level of performance expected from everybody in the industry."

67.     Furthermore, JUUL's product composition (which would have revealed the high nicotine content) and marketing would also have been a key part of the due diligence Altria engaged in when looking to invest in JUUL.  Furthermore, Willard, Gifford, and Crosthwaite, who were the primary Altria parties engaged in JUUL negotiations, were veterans of the tobacco industry and longtime employees at Altria or its predecessors.  Willard had spent his entire career at Altria or its predecessors, stretching back 25 years, so that he would have been around when Altria was settling the tobacco lawsuits with the state AGs.  Crosthwaite, who became JUUL's CEO in late 2019 when its business was tanking in the wake of the vaping illness epidemic, has also worked in the tobacco industry since 1997.  He was Altria's chief growth officer before he became JUUL's CEO, and he was president and CEO of Philip Morris from April 2017 to June

1    2018.  Gifford is now Altria's CEO and before then its Vice Chairman and CFO; he has worked

2    in Altria since joining Philip Morris in 1994 (where, like Crosthwaite, he also served a stint as the

3    president and CEO).

4    68.    Despite the reputational risks, the Altria Defendants doubled down and pressed

5    further for a transaction after Willard became CEO in February 2018.  As revealed in the Securities

6    Action, when Willard took over as CEO, he charged Crosthwaite with "get[ting] JUUL done."

7    And the FTC Action disclosed several meetings between Willard and Gifford, on the one hand,

8    negotiating directly with Burns, Pritzker, and Valani, on the other hand.  Thus, the public record

9    demonstrates the extensive involvement of all of the Altria Defendants in leading the transaction.

10    69.    Altria has defended its transaction as one where it sought to utilize its expertise to

11    curb underage vaping.  But Altria's defense in the FTC Action illustrates the incoherence of that

12    argument.  Atria cites a September 12, 2018, letter from then FDA Commissioner Scott Gottlieb

13    ("Gottlieb") to JUUL and three other vaping manufacturers that expressed concern that vaping

14    products were contributing to the "epidemic rate of increase in youth use" and called for

15    manufacturers to consider stopping sale of flavored products.  In its defense to the FTC Action,

16    Altria wrote that it "recognized the letter as creating new regulatory exposure for e-vapor products.

17    In response, on October 25, 2018, Altria determined to discontinue its Elite product and the

18    flavored MarkTen products (other than the traditional tobacco, menthol, and mint varieties)."  Yet

19    in the very next sentence, Altria also admits it "continued its efforts to reach a deal with [JUUL]."

20    The Altria Defendants running the deal, however, could not have failed to know that JUUL was

21    primarily known for its flavored products – the very kind the FDA expressed concern about – and

22    that JUUL was among the most notorious vaping companies to be popular among teenagers.

23    70.    And at another point in its FTC Action defense, Altria claimed that it pulled its

24    products because "[b]oth MarkTen and Elite lacked a key element for obtaining [Premarket

25    Tobacco Product Application ("PMTA")] approval – the ability to convert existing smokers and

26    thereby significantly reduce the overall harm to the health of American tobacco consumers."  Yet

27    the Altria Defendants knew that JUUL's ability to convert existing smokers was also unproven.

28

71.     In addition, Altria now appears to claim that JUUL's product could not win approval without Altria's regulatory guidance ("And, for its part, JUUL would lose the support from Altria that it needs to obtain PMTA approval and to pursue its mission to convert [adult] smokers."). But this contradicts Altria's stated rationale for investing in the first place, which was based on Altria needing to invest in a product that could win regulatory approval, or Altria is conceding that it invested in an illegal product – or a product with a high likelihood of becoming illegal – which itself would be a violation of fiduciary duty for the Altria Defendants to cause the Company to do so.

72.     Despite the extensive and well-known risks of investing in a scofflaw like JUUL, the Altria Defendants recklessly pressed ahead. They caused Altria to double its debt to pay for a $12.8 billion stake in a company that was coming under more and more regulatory and public scrutiny, making the risks even greater but the apparent reward smaller, since Altria would not be able to directly control the operations of JUUL and try to steer it into improved compliance (even if that were the intention, and as demonstrated below, that was not). Now, the damages of that reckless strategy have begun to be realized: increased exposure of Altria to civil litigation; the FTC Action; and a loss of more than $8 billion in value.

> ii)   The Altria Defendants Colluded with JUUL to Enable JUUL to Continue Targeting Youth and Make Misrepresentations, Knowingly Exposing Altria to Criminal Liability

73.     As alleged in the amended consolidated class action complaint in the Class Action, the JUUL and Altria Defendants directed and coordinated fraudulent acts to grow the market of addicted e-cigarette users.

74.     The Class Action alleges that throughout the 2017-2018 negotiation period, JUUL provided Altria with information regarding JUUL's design and nicotine content, and its advertising, retail distribution, online sales, age verification procedure, underage users' flavor preferences, and regulatory strategies. Altria also provided JUUL with advice in these areas.

75.     According to the Class Action, citing JUUL's internal documents, in the middle of the negotiations with Altria, Burns commissioned a study by McKinsey & Co. regarding the

"likability" of different flavors.  According to the Class Action, these studies were performed at the time when Altria and JUUL were coordinating their activities, and thus, Altria also helped conspire to keep the more "likable" flavors, such as mint, on the market.  Altria and JUUL, the Class Action alleges, sent coordinated communications to the FDA in 2018 to persuade it to allow mint to remain on the market, knowing that even if fruity flavors were removed, mint would become a substitute so that youth use would remain largely unchanged.

76.     In any event, Willard, Gifford, and Crosthwaite, as tobacco veterans, would have been familiar with how Big Tobacco marketed and targeted menthol – similar to mint – to young users, which by then was a well-documented phenomenon with studies and warnings published by the Federal government.

77.     Burns and other JUUL executives also hid the amount of nicotine in a JUUL pod. They consistently represented that a JUUL pod contains approximately the same amount of nicotine as a pack of 20 combustible cigarettes.  But according to an internal document cited in the Class Action, Burns was told in 2018 that each JUUL pod actually contained twice as much nicotine as a pack of cigarettes.  And while cigarettes deliver approximately 10% of the nicotine theoretically contained in their raw materials, the Class Action cites JUUL's internal studies showing that a JUUL pod can deliver almost 100% of the nicotine it contains.

78.     The Class Action, citing an internal JUUL document, also showed how new users did not understand the "5%" reference to mean concentration of nicotine; rather, new users often thought 5% meant that JUUL had 5% the nicotine of a cigarette. Pritzker and Valani, as board members with a detailed operational view of JUUL's business, knew about this confusion.  Yet, they and others in JUUL did nothing to correct this misperception.  The Class Action also pointed out how at least two independent studies have shown that JUUL's concentration is actually above 5%.

79.     Meanwhile, during this period and after the investment, the Altria Defendants knew these statements representing the nicotine content as equivalent to one pack of cigarettes was false, because in 2017 Altria launched its MarkTen Bold product at a 4% nicotine concentration, and

knew from internal studies that this concentration was approximately equal to the nicotine delivery of a pack of combustible cigarettes.  Crosthwaite, as the then head of Philip Morris, and Willard, as the then COO, and Gifford, as the then CFO, would have been aware of these studies because of the importance of e-cigarettes to Altria's growth plans, and especially important to their own purviews.  Furthermore, when their roles were elevated so that they had an even greater stake in understanding the e-cigarette market they certainly would have been aware of the strength of their own e-cigarette products, and they would have known that JUUL's product – being at a higher concentration – would be even stronger.  Moreover, as part of the due diligence in considering an investment in JUUL, Altria's top officers would have become familiar with JUUL's previous patent for the nicotine salt JUUL uses in its vaping liquid, which would have included detailed information about its nicotine metabolism.

80.   Moreover, JUUL's representation of nicotine strength by weight is contrary to the usual industry practice of representing nicotine strength by volume.  Thus, JUUL's 5% concentration claim by weight is actually equivalent to 6% by volume, which the Altria Defendants would have been familiar with owing to their leading roles in developing or marketing Altria's e-cigarette products and their long-time experience in the tobacco industry.

81.   By giving JUUL access to its retail shelf space and engaging in cross promotion, Altria became responsible for the misleading statements in JUUL's marketing campaigns or on its packages.  Because of Altria's nationwide network of retail partnerships, Altria is potentially subject to mail fraud claims.  The Altria Defendants knowingly allowed false statements in JUUL products to be put forth, and thus, violated their fiduciary duties by allowing false statements to be put forth.

82.   Among these false statements is JUUL's ad campaign, "Make the Switch," which gave the misleading impression that JUUL is a smoking cessation device.  JUUL's website made similar claims.  But JUUL's co-founder, during his Congressional testimony in July 2019, stated that JUUL was not a "smoking cessation" product but was rather a "consumer product" that he maintained was more effective at smoking cessation than what were traditionally, or by regulation,

recognized as smoking cessation products.  Altria also furthered JUUL's claim by calling it a "world leader in switching adult smokers."

83.    Although the JUUL ENDS was not an approved smoking cessation device, JUUL's campaign, "Make the Switch," used former smokers who emphasized "how JUUL helped them quit smoking."  The Altria Defendants nevertheless allowed written versions of the "Make the Switch" ad to be distributed with packages of Altria's combustible cigarettes, as part of Altria's marketing agreement with JUUL.  And JUUL's "Make the Switch" campaign drew scrutiny from the FDA, which sent a warning letter to JUUL in September 2019, that it was not an approved smoking cessation device and must avoid misleading potential consumers with such claims.  The FDA also took issue with statements from JUUL that it was "totally safe" or "99% safer" than cigarettes, because those claims had not been backed by scientific studies and had not been reviewed by the FDA.

84.    The Class Action also cites a JUUL internal document where a 2014 consumer study JUUL's predecessor commissioned concluded that the JUUL prototype was "liked" by a "younger group[,]" while "[t]he qualitative findings suggested this product isn't going to fit as well with consumers who are looking to cut back on the cigarette intake."  The researcher further noted that "[t]he delivery was almost too much for some smokers, especially those used to regular e-cigarettes."  This early research thus suggested that JUUL would cater to the young – possibly underage smokers – and to non-smokers, and that the nicotine delivery was stronger than expected, yet JUUL did not appear to make any attempt to weaken, or otherwise modify, its formulation, and indeed, when the product launched in 2015, doubled down on garnering a young customer base on the strength of its "Vaporized" marketing campaign.  The Altria Defendants, by causing Altria to continue to promote JUUL ENDS, were thus causing JUUL to distribute a nicotine delivery device intentionally targeted towards non-smokers and the underaged.

85.    Altria and JUUL's primary regulator, the FDA, clearly saw Altria's investment in JUUL, after earlier having pulled its own products from the shelf to ostensibly curb youth vaping, as a bait-and-switch and as collusion.  In March 2019, Gottlieb met with Altria and JUUL after he

called for them to explain their partnership, and he recounted his meeting and concerns shortly afterwards at a presentation at the Brookings Institute.

86.     Gottlieb recounted how in late 2018, he had asked tobacco companies to submit voluntary plans on how they would address the youth vaping crisis.  And Altria had submitted to the FDA "a 15-page, 16-page letter saying that they felt that the youth addiction crisis was being driven by the pod-based systems in particular and especially the flavored products.  And they said – they agreed to withdraw their pod-based products from the market at that time voluntarily and said that they wouldn't put flavored products on the market other than menthol in tobacco until they either have an authorized PMTA by the FDA or otherwise have evidence that the youth addiction crisis has abated."

87.     He then went on, "*it concerned me that a company that affirmed what we believe, which is that the pod-based flavored products are driving the youth use, and went so far as to take their product off the market and publicly make that statement*, at the time I put out a supportive message about that. . . .  *Then [Altria] made a substantive investment that – and also guaranteed that they were going to expand the market share of the leading pod-based flavored products that's being used by children*.  So there seemed to be a disconnect there and I wanted to understand whether they had new data that was driving that decision."  [Emphasis added].

88.     When asked if Altria brought new data to the meeting, Gottlieb stated, "Not that they brought to me.  Look, I think it was a *difficult meeting as far as meetings have gone*.  I have had probably in my time at FDA certainly less than 10 meetings with manufacturers.  And I can't remember a meeting that I had with a single manufacturer that wasn't with a tobacco company. . . .  So, you know, we've heard from them a number of times now and I think *I continue to have concerns that some of the activities that they're taking in the market are not necessarily consistent with what they're telling us, but certainly not consistent with what we think the broader public health objectives should be* and also what I view as the existential threat to this category, which is I'm having debates about whether or not flavored products should be sold in

convenience stores.  And I think the real debate is whether or not any of these products should be sold in convenience stores."  [Emphasis added].

89.     Gottlieb added further that the meeting "objective was to try to understand [Altria's] decision-making [in pulling their own vaping products but then investing in JUUL] from a public health standpoint and whether anything has changed in their view.  *And I didn't hear anything from that discussion that leads me to believe that they've seen something different in the market and that there was anything from a public health standpoint driving their decision, so I assume it's just a business decision that they made to withdraw a product that . . . didn't have good market penetration and then to go make an investment in a similar product that did have good market penetration*.  But I don't know exactly what their decisions were, but it certainly wasn't guided by anything that I heard related to any data or any kind of public health conclusion." [Emphasis added].

90.     Gottlieb noted that whatever decision the FDA makes as to restrictions or pulling back vaping products will depend heavily on youth usage data it was collecting, "Because at some point, regardless of your view on whether or not these products could help currently addicted adult smokers transition off of cigarettes, the youth use is so widespread, so rampant that whatever redeeming public health value these tools could potentially have, and they haven't demonstrated that yet, it's offset by the youth use.  And remember, the statute requires FDA to overweight tobacco use among kids. . . .  So we explicitly have to look at the youth use and it doesn't take a lot of complicated math to overweight this youth use.  It's pretty rampant."  Gottlieb further noted, "What I think changed our policymaking was the explosion in the use of nicotine by children.  *And I think that the comments from the e-cigarette community have been overly dismissive of that risk.  And I think that the positions that they've taken have created an existential threat to be the entire category because I think that they have been insufficient in terms of their earnestness and seriousness about addressing that problem*."  [Emphasis added].

91.     Despite their knowledge of JUUL's marketing problems and pervasive use among youth, the Altria Defendants continually downplayed the problem in public statements, and thus,

1    through their statements continued to collude with the JUUL Defendants on misrepresenting the

2    extent of JUUL's illegal underage targeting and the nicotine content of JUUL:

3        (a)   In announcing the JUUL transaction, on December 20, 2018, Willard was

4            asked by an analyst, "how much of JUUL's business over the last 12 months

5            have you concluded comes from underage consumers?  And how confident

6            are you that progress can be made to eradicate that consumption? . . .  [W]hat

7            is the risk that you assigned to the idea that JUUL's products ultimately may

8            not receive FDA approval . . . given their known association with underage

9            consumption?"  Willard responded, "I think it's hard to nail down exactly

10           how much of the volume . . . could be attributed to underage use.  We believe

11           it's quite a small percentage. . . .  We have access to information through our

12           measurements of the legal age plus adult cigarette consumer.  And we see

13           significant interest and significant purchase of JUUL by adult cigarette

14           smokers.  So I think the overwhelming percentage of their volume is actually

15           other tobacco users, adult tobacco users that are interested in the category."

16           Gifford, on the same call and with access to the same information Willard

17           had, did nothing to correct the impression Willard gave that the JUUL

18           consumer base was overwhelmingly adult smokers rather than the underage

19           or non-smokers.

20       (b)   Willard also extensively discussed JUUL on the February 20, 2019, call to

21           discuss the Q4 2018 earnings of Altria.  He acknowledged "that the long-term

22           opportunity of tobacco harm reduction is threatened by continued underage

23           use."  But he went on to emphasize, "JUUL has already taken significant

24           action to address these concerns."  At the same time, when responding to a

25           question about how JUUL ad or coupon inserts in Marlboro packs could

26           cannibalize the latter, Willard showed awareness that JUUL appealed to

27           youth.  He stated, "I would point out that I think JUUL tends to get more of

28

its growth from the 21- to 29-year-old cigarette smoker than it does from the 30-plus cigarette smoker."  And when pressed on how the FDA appeared to be ramping up regulation of e-cigarettes, Willard acknowledged, "I don't think we've been surprised at FDA's concern about youth usage of e-vapor products.  I think, as you know, both JUUL and Altria, we were talking to them in November.  They had a high level of concern then. . . .  And so I think that our view is that it's important to drive down youth usage in order to preserve this opportunity for adult cigarette smokers to be able to switch to a very compelling noncombustible product . . .  I think we'll drive down youth usage and still make this available to adult cigarette smokers as an alternative."  Later on in the call, in discussing the Marlboro-JUUL cross-promotion, Willard again characterizes JUUL as a "harm reduction" opportunity.  Gifford, on the same call, and having participated in the same negotiations, did nothing to correct impressions Willard gave that JUUL was a smoking cessation device that did not have significant youth appeal.

(c)     On May 1, 2019, in discussing the Q1 2019 earnings, Willard was again asked about how Altria and JUUL's engagement with the FDA and FTC were like.  Willard insisted that while "most of the dialogue we've had with FDA . . . really starting in October [2018], has really been focused on – FDA is concerned about youth usage of e-vapor products . . . .  JUUL and I have been on the leading edge of really proactively addressing that issue."  He declined to respond substantively regarding the FTC review, noting "the FTC tends to make a decision based on its own analysis, and applied against the rules that it's focus[ed] on discharging."  And in response to a question about whether JUUL appeals to "high-nicotine markets" while Altria's heated tobacco IQOS device appeals to "low-nicotine markets[,]" Willard insisted that "the difference between a consumer picking at [sic] JUUL or an IQOS is more

likely to be related to other factors[.]"  Furthermore, while Willard had previously stated that he thought the percentage of JUUL users who were underage was low, he admitted here that JUUL's withdrawal of flavors in late 2018 was "likely to have some help on driving down youth vaping[.]"  Willard also confirmed the extent of JUUL and Altria's coordinating, confirming that "JUUL[,] like the other operating companies at Altria[,] can access – or can provide offers to customers that are on [Altria's] adult tobacco consumer database" while Altria's "Board observer [at JUUL] has access to the communications that they share with the Board members."  Gifford, on the same call and having also had a leading role in directing the Altria transaction, did not correct Willard's statements that gave the impression that JUUL was a responsible actor with a relatively limited youth usage problem.

(d)  At the annual meeting of May 16, 2019, Willard was asked about the class action lawsuits against JUUL for its marketing toward underage users, and what Altria was doing "to protect its $12.8 billion investment in JUUL by making JUUL less vulnerable to lawsuits of this type?"  Willard acknowledged, "We were aware, when we made the investment in December, that there was some early litigation, and certainly more litigation has come forward.  I can tell you that, at Altria, we are very committed to helping address the increase in youth e-vapor use and to encouraging JUUL to make sure that their marketing is only to adult cigarette smokers."  In response to another question concerning the "latest development against e-cigs," Willard continued to maintain that JUUL was one of several products that "is going to increase the amount of switching that occurs, I think, to the benefit of driving harm reduction."  In response to a question that "do you feel that the scrutiny on JUUL has poorly reflected on Altria as a responsible corporation?  And with JUUL's questionable marketing practices, will this reignite

criticism of Altria's marketing practices?"  Willard emphasized that JUUL "is demonstrating a very significant impact on converting adult cigarette smokers down the continuum of harm."   While acknowledging the "significant increase in youth use of e-vapor products," and even while acknowledging that JUUL had "contribut[ed] most of the growth" in the vaping market, he disclaimed whether Altria or JUUL had responsibility for the youth vaping crisis, instead stating that the increase in youth vaping generally has caused Altria and JUUL to mobilize, to help contribute to reducing the problem" and "JUUL has the opportunity to drive down significantly the number of adults that use combustible cigarettes.  And I think, ultimately, we will address the youth e-vapor problem."  In response to another question about why Altria does not focus on limiting vaping flavors despite studies showing the majority of underage users vape for flavor, Willard side-stepped the question by stating that Altria has been trying to push to raise the minimum age of purchase for tobacco products from 18 to 21.  Gifford did nothing to correct any of Willard's defenses of Altria.

(e)     And in discussing JUUL during the Q2 2019 quarterly earnings call held on July 30, 2019, when an analyst asked him, "What do you think is actually just driving that success of JUUL and actually being a contributor to all that additional growth?"  Willard replied, "I think it's further evidence of the fact that amongst adult tobacco consumers, I think JUUL has real brand equity and I think it has a superior product.  And I think that as more and more adult tobacco consumers are exposed to the product, I think, increasingly, folks are adding JUUL to their tobacco product use and as you saw from the numbers, that they're setting down their cigarettes and moving over exclusively to e-vapor, I think in increasing numbers as well."  When pressed on how much of the share of youth usage JUUL is contributing to, Willard sidestepped the

question by demurring, "I don't know that I'm in a position to be able to forecast what the youth numbers are going to show in the third quarter when they come out."  He also claimed, "Clearly, that switching and particularly the switching to e-vapor use without continuing to use cigarettes is accelerating.  So I think[,] ultimately[,] FDA is going to have to balance that favorable adult moving down the continuum of harm, which is quite strong and quite favorable against the fact that youth e-vapor rates have not yet stepped down."  In response to another question about regulatory approval for JUUL when "their current product is clearly associated with underage usage," Willard replied, "I don't know that I have more to say on that topic.  I think the youth usage of e-vapor products is a challenge that every filer is going to have to deal with" and suggested that "FDA can approve[] [c]ertain products [and] require post-market surveillance[.]"   Gifford, also on the call, did nothing to correct any misperception that youth use was merely a challenge for the vaping industry in general and that JUUL was focused on converting adult smokers.

(f)   Despite the optimistic picture Willard presented as to JUUL's continued strong performance at the Q2 2019 call, by the Q3 2019 call, held on November 3, 2019, Willard struck a much less optimistic tone as JUUL's reputation and business nosedived in the wake of a vaping illness epidemic. Willard admitted, "the e-vapor category faces a critical inflection point. . . . [W]e're now projecting lower e-vapor category volumes in the U.S. versus our original estimates, which resulted in a third quarter noncash impairment charge of $4.5 billion related to our JUUL investment."   Gifford also admitted, "when you think about the international markets, I think you've seen several countries take action on e-vapor based on what they were seeing take place in the U.S."  Willard continued to maintain that he "believe[s] that

JUUL is highly likely to end up filing a successful application [with the FDA]. . . . [T]he JUUL product, I think, has distinguished itself compared to other e-vapor products as having quite a significant success at convincing adult cigarette smokers to convert ultimately to exclusive use of e-vapor."  Gifford did nothing to correct potential misrepresentations that Willard was making regarding JUUL's success at getting adults to switch while de-emphasizing or ignoring youth usage.

(g)  By the Q4 2019 earnings call, held on February 5, 2020, Willard admitted, "We are disappointed in the performance of our JUUL investment in 2019[,] [a]nd we reported a second impairment of the JUUL investment. . . .  It's a critical time for the e-vapor category. . . .  We believe that the e-vapor category in its current form needs a reset[.]"  Nevertheless, as in the past, Willard continued to express optimism that the FTC would approve the transaction, stating that Altria now expected approval by "first half of 2020."  But less than two months later, the FTC filed its action seeking to reverse the investment.  Gifford further explained that Altria "recorded an additional $4.1 billion impairment to our JUUL investment, primarily driven by the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase.  Since our last quarterly earnings announcement on October 31, 2019, the number of cases pending against JUUL has increased by more than 80%. . . .  The latest impairment brings the current value of our investment to $4.2 billion [more than a 2/3 drop in value from Altria's initial $12.8 billion investment].  As we said earlier, we're disappointed in the performance of the past year and hope JUUL can move forward more constructively."  In responding to a question about why Altria was no longer providing marketing support to JUUL, or any other non-regulatory support, and whether that was "an anticipation of FTC

review[,]" Willard stated, "it's not related to the FTC review."  Instead, Willard claimed that the other services were being pulled because JUUL and Altria duplicated services and "created confusion" where both companies were involved in the retail landscape for JUUL.  When confronted with a question, "Is there any evidence of an improvement in JUUL's youth usage trends based on recent surveys?"  Willard would only respond, "I think that there is reason to be optimistic that there is going to be an improvement or reduction in youth usage of e-vapor products" because "we now have a minimum age of purchase of 21 nationwide" and "the FDA has now provided nationwide guidance that's in effect that is going to restrict, certainly for pod-based e-vapor products, the availability of flavors to tobacco and menthol.  I think that should have a positive impact on driving down youth usage rates and, certainly, I would expect that the JUUL usage would decline as well."  When confronted with the question, "And on the FTC review, obviously, you'd said you thought it would be resolved in the first quarter and now it's pushed out to the first half. . . .  Is that delay any cause for concern?"  Willard responded, "I don't think it is a cause for concern. . . .  [T]here were some scheduling delays that pushed it likely out of the first quarter.  But I don't think it's driven by anything more than that."  And in response to a question "You personally made the case for this big bet on JUUL.  You made the case to shareholders, to your own board members. . . .  Are you feeling frustrated that JUUL didn't act sooner to address regulators' concerns?  Are you feeling regret for having invested in JUUL in the first place?"  Willard responded that while he was "highly disappointed in the financial performance of the JUUL investment[,]" he stressed that "there were a number of unexpected outcomes in the year.  Probably the one that I think was hardest to have forecast was the appearance of the serious lung injury. . . .  I would, however, note that JUUL

was the market share leader and the volume growth leader in 2019.  And I think while there's going to be a reset in the category that I think is an appropriate reset to drive down youth usage."  And in response to a question about "How are you calculating the litigation risk from JUUL?  And are there steps you can take to isolate yourself given the way the deal was structured in terms of indemnification agreements or agreements not to indemnify?"  Gifford responded, "[W[e did not assess the merits of the cases. . . .  We really looked at assessing the risk of the uncertainty related to the litigation. . . .  As far as the structure of the agreement. . . we do assess the merits of the cases that we're named in, and we think [they're] meritless[.]"   Thus, Gifford implicitly admitted that the only recourse is defending the litigation and that Altria had not sought protection through indemnification.

(h)   At the Q1 2020 Altria earnings call, held on April 30, 2020, Gifford by then was the CEO (with Willard having recently announced his retirement after recovering from Covid-19).  Gifford noted that the FTC "recently announced its decision to file an administrative complaint challenging the [JUUL] transaction.  The FTC alleges that our minority investment is anticompetitive due to our decision to close the [Nu Mark] operating company in the fourth quarter of 2018.  We intend to vigorously defend the investment."  However, Gifford conveniently neglected to mention that the FTC case was not based solely on Altria's exit of the e-cigarette market but also included allegations concerning Altria's marketing support for JUUL at the time of the transaction and Altria's commitment to not compete in the field with any other e-cigarette products.  Also, in response to a question about JUUL's restructuring and outlook, Gifford maintained, "we think they're making the right decisions."

iii)   <u>The Altria Defendants Engaged in an Antitrust Conspiracy with the JUUL Defendants</u>

92.   The FTC, in an administrative complaint filed on April 1, 2020, alleged that Altria actively colluded with JUUL to stifle competition in the vaping market.  The FTC Action detailed numerous discussions and meetings between Willard and Gifford, on behalf of Altria, and Burns, Valani, and Pritzker, on behalf of JUUL, where the clear import of the discussions – even when the actual text was redacted – was to convey that JUUL would only do a deal if Altria agreed to withdraw from the e-cigarette market and refrain from competing in it going forward.  According to the Securities Action, Willard also directed Crosthwaite, as Altria's then CGO, to "get JUUL done," and therefore, Crosthwaite was also involved in negotiations, whether on the front line or in preparing Willard and Gifford.

93.   Although the actual discussion was redacted, the FTC complaint made it clear that Burns, Pritzker, and Valani all made it clear that they would only agree to a transaction with Altria if Altria exited the e-cigarette market.  Among other actions, Pritzker sent an opening term sheet to Willard, on July 30, 2018, and the FTC revealed, "Continued competition from Altria's e-cigarette products was the only option clearly off the table."

94.   This point was reinforced at a Washington, D.C., meeting between Valani, Pritzker, Riaz, and Burns, from JUUL, and Willard and Gifford, from Altria, to discuss these terms.  Willard appeared to then reinforce his understanding on a call with JUUL on or about August 5, 2018.  When Gifford attempted to send over a revised draft term sheet that weakened the non-compete, Pritzker, Valani, and Burns reacted negatively.

95.   Valani also impressed this no-compete point on Altria Board director Dinyar DeVitre at a meeting in New York City on August 15, 2018, shortly before an August 31, 2018, negotiation session between Altria and JUUL in San Francisco.

96.   On October 5, 2018, Willard sent Pritzker, Valani, and Burns a letter that appeared to give in on the non-compete issue.  Burns then appeared to tell JUUL's chief legal officer that those terms were acceptable.

97.     On October 25, 2018, Altria announced that it would temporarily halt sales of its MarkTen Elite, citing concerns with youth vaping.  Just a few days later, Altria announced its deal with JUUL, which included not competing with JUUL in e-cigarettes.  By December 7, 2018, Altria further announced that it would wind down its remaining e-cigarette business.

98.     On December 9, 2018, Altria's chief legal officer e-mailed his counterpart at JUUL to discuss the deal.  Less than two weeks later, JUUL and Altria executed their transaction agreements.  Not only did Altria concede its own e-cigarette market, but it also agreed to refrain from other acquisitions or partnerships through which Altria could participate in the e-cigarette market.

99.     When Altria initiated its investment in JUUL, it did not require Hart-Scott-Rodino Act ("HSR") clearance, because its stake was non-voting.  However, in February 2019, it filed for HSR clearance when it sought to convert its interest into voting securities and sought to have the right to appoint three out of the nine members of JUUL's board.  At that time, the FTC became aware of Altria's non-compete agreement with JUUL:

> [Altria] shall not . . . directly or indirectly: (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business). . . .  Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke,

MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued. . . .

100.    And in fulfillment of this promise, Altria did pull its e-cigarette products from the market.  As discussed above, the FDA Commissioner, upon seeing the news of Altria's pending investment, expressed consternation because he thought Altria had earlier represented it would quit the e-cigarette market because of the risk of youth use, but now was investing in a company whereby in late 2018 it was well known had a problem with youth use.

101.    Furthermore, Altria agreed to provide services to JUUL by leasing convenience store shelf space to JUUL, providing regulatory consulting, and distribution support.  This included direct marketing and cross-promotions, such as putting ads for JUUL pods in Marlboro packages.  Altria also gave JUUL a license over Altria's e-cigarette portfolio.  Thus, at the same time that Altria cleared the way by removing its own products, it was taking affirmative steps to further bolster JUUL's market leadership.

102.    Nor does Altria deny that the non-compete for JUUL is anti-competitive.  Rather, it claimed the non-compete was "reasonably ancillary to the pro-competitive benefits provided by the transaction," purportedly from leveraging JUUL's technical know-how and Altria's distribution expertise and regulatory know how.  Yet, Altria does not explain why the latter are actually "pro-competitive," since they would have the effect of cementing the lead position of the incumbent market leader further, and thus, entrenching the market leader rather than provide space for competition.

103.    Shortly after the investment was made, there were news reports that indicated active collusion between Altria and JUUL.  A March 30, 2020, *New York Times* article entitled, *The World Pushes Back Against E-Cigarettes and JUUL*, reporting on JUUL's struggles with

expanding overseas, opened with a talk by Willard to JUUL employees, in January 2019, telling approximately 200 senior executives of JUUL, at a meeting in East Palo Alto, to expand overseas. Willard observed, "I believe that in five years, 50% of JUUL's revenue will be international." Burns, JUUL's CEO, interjected, "I told the team to achieve that in one year!"  Thus, at this time, JUUL and Altria were actively coordinating on their strategy for expanding JUUL's market, even though JUUL was purportedly an independent company from Altria.

104.    The opportunity for collusion was great, as FTC commissioners, Rohit Chopra and Rebecca Kelly Slaughter, pointed out in a separate statement, because Altria had an executive observer who sat in on JUUL's board meetings.  As the FTC Commissioners pointed out, giving Altria a board observer seat meant that Altria would have access to JUUL's non-public business strategy and trade secrets, as well as information relevant to how Altria and JUUL could compete in other areas.  But with this information access, Altria could further steer itself to go out of JUUL's way, which it already had demonstrated previously through the non-compete agreement.  For example, the Commissioners noted that tobacco products are often sold behind the counter, and tobacco companies and e-cigarette companies may compete by offering promotions and other incentives to retailers in return for that space.  But with Altria investing in JUUL, it has an incentive to compete less hard for that retail space, knowing it can share in the upside if JUUL is its competitor for that space.  This could also affect Altria's sourcing decisions and recruitment decisions, to the extent Altria now knows JUUL's sourcing or recruiting plans.  The Commissioners noted, "In light of these realities, allowing a situation where Altria has potential access to JUUL's operational and development plans puts too much risk on consumers and flies in the face of one of the underlying premises of the FTC Act: '. . . [T]o stop in their incipiency acts and practices which, when full blown, would violate [the Sherman Act and the Clayton Act]. . . .'" [alteration in original].

105.    Moreover, between when the transaction closed in December 2018, to his ascension as JUUL's CEO in late September 2019, Crosthwaite remained Altria's CGO and was also their designated observer on JUUL's board.  Thus, he had direct access to JUUL's confidential

information and could directly coordinate Altria and JUUL's activities.  As JUUL's CEO, he continued to have direct contact with Altria because Gifford then replaced him as the Altria board observer.  Similarly, from late September 2019 to the present, when Gifford took over as the Altria Board observer at JUUL, he had direct access to JUUL's information and could coordinate activities between JUUL and Altria.  Those opportunities have only become greater since the end of April 2020, when Gifford become Altria's CEO.

106.    In January 2020, under increasing pressure from regulators, Altria and JUUL revised their agreements.  The Voting Agreement provided for one fewer Board seat for Altria (two out of nine instead of three out of nine), once the transaction has been approved by the FTC, but this formal decrease in Board seats was more than made up by the fact that the executive ranks of JUUL were closely related to the executive ranks of Altria because JUUL's CEO was Altria's former growth officer, Crosthwaite, who was Altria's designee board observer on JUUL's board.  Moreover, JUUL brought in Murillo to help it manage its regulatory affairs, who was the chief regulatory officer at Altria and the head of Altria's e-cigarette business.  Furthermore, Gifford, who had a direct role in negotiating the Altria investment, was now the Altria observer on JUUL's board, and in June 2020, Gifford become Altria's CEO.

107.    And other aspects of the Voting Agreement provided for Altria to have a ***greater*** role in controlling JUUL.  Under the revised Voting Agreement, Altria will appoint one of the four members of JUUL's Nominating Committee, which would be able to veto the nomination of independent JUUL directors, and appoint two out of the five – and the Chair – of a new Litigation Oversight Committee – as well as one out of three members of a Litigation Subcommittee that would have the right, through a unanimous vote, to change JUUL's senior outside counsel on litigation matters involving both Altria and JUUL.

108.    Altria and JUUL also weakened the non-compete by allowing Altria to re-enter the e-cigarette market if Altria's valuation of JUUL fell under 10% of its original valuation or a year after JUUL is prohibited from selling its products by the Federal government.  But this revision actually laid bare Altria's original motivation: to bolster JUUL's chances in return for getting out

of JUUL's way.  Now that JUUL's chances were decreasing, Altria wanted the option to get back in the market in case JUUL failed.

109.    Under increasing regulatory scrutiny of JUUL's marketing and use by teenagers, Altria also stopped providing marketing services.  But Altria continues to provide regulatory advice to JUUL, and will be in closer physical proximity to JUUL as the latter seeks to move its headquarters to Washington, D.C., while Altria is headquartered in Richmond, Virginia, and this regulatory advice could also potentially help entrench JUUL's position as the market leader, if JUUL ultimately has its product approved by the FDA while lesser competitors who cannot draw on the same regulatory expertise get shut out.

### D.    JUUL Aids and Abets Altria Defendants' Breach of Fiduciary Duty

110.    JUUL – through its main Altria negotiators Pritzker, Valani, and Burns, and later on through Crosthwaite, as well – knew that causing Altria to collude with it on youth marketing and capturing the e-cigarette market would cause Altria's officers to cause Altria to engage in illegal activity, and therefore, breach their fiduciary duties to Altria.  Each JUUL Defendant was well-versed in fiduciary duties, having served either as high-ranking executives or as board directors in numerous capacities.  Pritzker and Valani, in particular, not only served as JUUL's board directors, but they actively managed the company and led its negotiations with Altria.  And, Crosthwaite would have become familiar with JUUL's governance as Altria's designated board observer at JUUL, before he ascended to JUUL's CEO position and became a voting director on JUUL's board.  By their direction and control of JUUL, the JUUL Defendants also made JUUL liable for their actions.

111.    The JUUL Defendants would also have been familiar with the laws and regulations affecting the tobacco industry, owing to their long tenures in JUUL and Altria.  Pritzker, in addition, would have had experience with the tobacco industry before JUUL, because he helped run and then sell Conwood, a tobacco company, to R.J. Reynolds Tobacco Co. in 2006.

112.    Furthermore, the JUUL Defendants would have been familiar with how JUUL was violating the law by targeting youth and misrepresenting its nicotine content and safety, because

they were heavily involved in JUUL's operations and had access to all of the key documents and decision-making within the company. Burns was the CEO of JUUL, and therefore, had in-depth knowledge of its operations. Pritzker and Valani, similarly, were active Board directors who engaged in day-to-day management of the Company; early in JUUL's history, in 2015-2016, they shoved aside the founders and, along with fellow JUUL director Huyoung Huh (who was Pritzker's investment fund's other designee on JUUL's board), formed an Executive Committee that took over the operations of the Company until a new CEO was hired. Pritzker and Valani showed that they continued to be far more involved in JUUL's operations than most Board directors when they spearheaded the transaction with Altria, and insisted on specific conditions, such as the non-compete.

113.     Thus, the JUUL Defendants knew that JUUL was illegally misrepresenting its safety and nicotine content, and was illegally targeting teenagers with its marketing. The JUUL Defendants would also know that they were causing Altria to violate the law by insisting that Altria provide shelf space and marketing for JUUL's products that contained these misleading statements or were geared toward underage users. The JUUL Defendants thus caused the Altria Defendants to agree to an arrangement, as a condition for closing the transaction, that they knew would cause Altria to violate the law.

114.     Moreover, when negotiating the investment, Burns, Pritzker, and Valani insisted on the violation of antitrust laws by forcing the Altria Defendants to agree to have Altria withdraw from competing in the e-cigarette or vaping market. Burns, Pritzker, and Valani, as experienced senior executives, investors, and board directors, were familiar with antitrust laws and with how imposing this condition was a violation of the antitrust laws. They were further aware of how forcing Altria to provide marketing and distribution services, which would bolster JUUL's existing dominance of the vaping market, would exacerbate Altria's violation of the antitrust laws.

**E.      Altria Suffers Ongoing Damages from Defendants' Misconduct**

115.    The Altria Defendants, by directing Altria to collude with JUUL on violating the antitrust laws and colluding with JUUL on youth marketing, caused enormous and ongoing damages to the Company.

116.    First, the public scrutiny of JUUL has led to a decline in JUUL's business, which was exacerbated by the vaping epidemic in the summer and fall of 2019.  JUUL's decline in business and in growth prospects meant that Altria had to write off, ultimately, two thirds of its investment in JUUL, or over $8 billion.  Meanwhile, to raise the funds for its $12.8 billion investment, Altria had doubled its debt in 2018.

117.    Furthermore, Altria is now the target of numerous lawsuits, including the FTC Action, at least six to 10 private antitrust suits making similar allegations, and hundreds of product liability cases where JUUL and Altria are named as joint defendants, as well as the Securities Action.

118.    Because of the ongoing lawsuits and regulatory scrutiny, the damages are ongoing and continue to the present day.

**VI.     DERIVATIVE ALLEGATIONS**

119.    Plaintiff brings this action derivatively in the right of, and for the benefit of, Altria to redress the breaches of fiduciary duty, aiding and abetting such breaches, and other violations of law committed by the Altria and JUUL Defendants, as alleged herein.

120.    Plaintiff is a current stockholder of Altria and has continuously held Altria stock for the duration of the Relevant Period, and will continue to hold Company stock through the resolution of this Action.

121.    Plaintiff will adequately and fairly represent the interests of Altria and other Altria stockholders in enforcing and prosecuting Altria's rights, and Plaintiff has retained counsel experienced in prosecuting this type of derivative action.

122.    Plaintiff made two demands on Altria's board, on February 14, 2020 and April 21, 2020 (attached as Exhibits A and B, respectively), and under the Virginia Stock Corporation Act,

waited for more than the 90-day waiting period, counting from the date of the second demand, to file this action.  It has now been 118 days since Plaintiff made his latest litigation demand.

123.    In addition to the statutory period passing by which a lawsuit may be brought, demand has been constructively wrongfully refused because the Board refuses to substantively evaluate Plaintiff's demand until the resolution of the motion to dismiss of the Securities Action. There is no justification for this position because the Securities Action is substantively different from this Action, and because it is unclear when the Securities Action will be resolved.

## VII.    FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty
**Asserted by Plaintiff on Behalf of the Company Against the Altria Defendants**

124.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

125.    The Altria Defendants each owe (and owed) Altria and its stockholders fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's affairs.

126.    As detailed above, the Altria Defendants breached their fiduciary duties by permitting Altria, its directors, and officers to participate in illegal, anti-competitive, or misleading conduct.

127.    As a direct and proximate result of the Altria Defendants' breaches of their fiduciary duties, Altria has been damaged monetarily and through incurring reputational harm.

128.    The Altria Defendants are therefore liable to Altria for the damages Altria sustained.

## VIII.    SECOND CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty
**Asserted by Plaintiff on Behalf of the Company Against the JUUL Defendants**

129.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

130.    By knowingly inducing the Altria Defendants to take the aforementioned wrongful actions, the JUUL Defendants knowingly participated in the Altria Defendants' breaches of fiduciary duty.

131.    The Company suffered, and is suffering, damages as a proximate result of the Altria Defendants' breach of fiduciary duty.

132.    As a result, the JUUL Defendants aided and abetted the Altria Defendants in their breach of their fiduciary duties.

133.    The JUUL Defendants are therefore liable to Altria for the damages Altria has sustained.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of the Company, derivatively, seeks judgment against the Altria and JUUL Defendants as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Altria and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that the Altria Defendants have breached their fiduciary duties to Altria;

C.    Declaring that the JUUL Defendants have aided and abetted the Altria Defendants in their breaches of fiduciary duty;

D.    Determining and awarding to Altria the damages sustained by it, as a result of the breaches of fiduciary duty and aiding and abetting of such breaches set forth above from each of the Altria and JUUL Defendants, jointly and severally;

E.    Awarding to Altria restitution from the Altria and JUUL Defendants and ordering disgorgement of all improperly attained profits, benefits, and other compensation obtained by them;

F.    Directing Altria to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its stockholders from recurrence of the damaging events described herein;

G.      Awarding to Plaintiff the costs and disbursements of the Action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

H.      Awarding pre- and post-judgment interest; and

I.      Granting such other and further relief as the Court deems just and equitable.

## X.      JURY DEMAND

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: August 7, 2020                    Respectfully Submitted,

SCOTT+SCOTT ATTORNEYS AT LAW LLP

/s/ John T. Jasnoch
John T. Jasnoch
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone:  216-229-6088
Facsimile:   860-537-4432
gjohnson@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Jing-Li Yu
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jyu@scott-scott.com

*Attorneys for Plaintiff*

**VERIFICATION**

*Thomas Sandys v. Howard A. Willard III, et al.*

I, THOMAS SANDYS, declare:

I am the Plaintiff in the above-entitled matter. I have read the foregoing Verified Shareholder Derivative Action Complaint and know the contents thereof.

The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe those to be true.

Executed on __08 / 06 / 2020__, at 3512 Boulder Ridge Drive, Maumee, Lucas County, Ohio 43537.

I declare under penalty of perjury that the foregoing is true and correct.

*thomas sandys*

_____
THOMAS SANDYS